IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| THOMAS LORDY GILLILAND, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 6:14-cv-92 |
| | § | |
| COMMISSIONER, SOCIAL SECURITY | § | |
| ADMINISTRATION. | § | |

## MEMORANDUM OPINION AND ORDER

On February 12, 2014, Plaintiff initiated this civil action pursuant to the Social Security Act, Section 205(g) for judicial review of the Commissioner's denial of Plaintiff's application for Social Security benefits. This civil action is assigned to the undersigned to conduct all further proceedings in this case, including entry of final judgment. Doc. No. 10.

## BACKGROUND

On January 13, 2011, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging that disability began July 1, 2002. *See* Transcript ("Tr.") at 12 (ADMINISTRATIVE LAW JUDGE ("ALJ") DECISION). The claim was initially denied on April 21, 2011, and upon reconsideration on June 1, 2011. *Id.* Plaintiff sought review of the denials. An administrative hearing was conducted before the ALJ on February 13, 2012. *Id.* at 12, 33-54 (hearing transcript). Plaintiff appeared and testified, represented by counsel. *Id.* Lakedra Parker, an impartial vocational expert witness, also testified. *Id.* The ALJ issued an unfavorable decision on October 24, 2012, *id.* at 12-26, and Plaintiff sought review. On December 19, 2013, the Appeals Council denied review. Tr. at 1-3. Therefore, the ALJ's decision became the Commissioner's final decision. *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Plaintiff then filed the instant action for review by this Court.

1

**STANDARD**

Title II of the Act provides for federal disability insurance benefits while Title XVI provides for supplemental security income for the disabled. Judicial review of the denial of disability benefits under section 205(g) of the Act, 42, U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner]'s, even if the evidence preponderates against the [Commissioner]'s decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather, conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); Anthony, 954 F.2d 289, 295 (5th Cir. 1992) (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000); SSR 96-5p, 61 Fed. Reg. 34471 (July 2, 1996).

"Substantial evidence is more than a scintilla but less than a preponderance–that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*,

271 Fed. App'x 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n.4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). However, the Court must do more than "rubber stamp" the ALJ's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner]'s findings." *Cook*, 750 F.2d 391, 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five-step, sequential process. *Villa*, 895 F.2d at 1022. A finding of "disabled" or "not disabled"

at any step of the sequential process ends the inquiry. *Id.; see Bowling*, 36 F.3d at 435 (citing *Harrel*, 862 F.2d at 475). Under the five-step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two, the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the Commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non-severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 416.920(b)-(f) and 404.1520(b)(1)(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three, or an affirmative answer at Steps Four and Five, creates a presumption of disability. *Id.* The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot perform his past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ made the following findings in his October 24, 2012 decision:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 1, 2002 through his date last insured of December 31, 2007 (20 C.F.R. § 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following medically determinable impairments: mild degenerative disc disease of the cervical spine, without radiculopathy; mild spondylosis and degenerative disc disease of the lumbar spine, without radiculopathy; and schizophrenia (20 C.F.R. §§ 404.1521, *et seq.*).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that were more than slight abnormalities [having such a minimal effect on the claimant that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *See Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985); (20 CFR 404.1521; Social Security Rulings (SSRs) 96-3p, and 96-4p] which did not limit his ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521, *et seq.*).

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2002, the alleged onset date, through December 31, 2007, the date last insured [20 CFR 404.1520(c)].

Tr. at 14-26. The ALJ determined that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. at 26.

## ANALYSIS

Plaintiff was born on October 31, 1962. Tr. at 35. He has two years of college education and an Associate's Degree from Tyler Junior College. *Id.* at 36, 39. His past relevant work experience includes 15 years as an eyeglass maker. *Id* at 36.

Plaintiff asserts that he cannot work due to degenerative disc disease, damage to lower spine, fused vertebrae in neck, schizophrenia, hearing loss in both ears, and depression. Tr. at. 151. At the administrative hearing, Plaintiff stated he could not turn his neck to look through the instrumentation required to make glasses as a result of neck and back injuries. His attempts to elevate the equipment so he would not have to lean over were eventually ineffective. Tr. at 38. As a result, his boss placed him on "indefinite medical leave" in 2002 and Plaintiff has not worked since. Tr. at 37.

Plaintiff additionally testified that his neck and back injuries were sustained during his time in the service. Tr. at 38. He was honorably discharged from the U.S. Navy as a result of the injuries on November 1989. Tr. at 39. The VA has assessed him as 80 percent disabled and placed him on 100 percent "unemployability." Tr. at 40. Fifty percent of his disability is attributed to psychological issues. Tr. at 41. Plaintiff stated he was told at the time he left the service that he would eventually need surgery for the fused vertebra in his neck and the bone spurs growing as a result of limited movement. Tr. at 41. Since then, surgery has not been recommended for his neck or back except for a morphine pump which he does not want. Tr. at 40-41. When asked by the ALJ, he stated he is not overweight. Tr. at 42.

Plaintiff's appeal is based on whether sufficient evidence exists to establish severe impairment. An impairment is "severe" if the claimed physical and/or mental impairments have a significant impact on the claimant's ability to function and impose more than minimal limitations upon a claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521, 416.920(c), 416.921; SSR 96-3p, 1996 WL 374181. By its own terms, this is a *de minimus* test — intended to weed out the most minor of impairments. *Bowen v. Yuckert*, 482 U.S. 137 (1987); *see also Wilson v. Colvin*, 2013 WL 3777078, at *8 (N.D. Tex. July 17, 2013) ("The step two requirement that the claimant have a severe impairment is generally considered to be 'a de minimis screening device to dispose of groundless claims.'" (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)).

*Medical Evidence*

The following evidence regarding Plaintiff's medical history is contained within the Court's record:

Plaintiff was seen at **Trinity Mother Frances** on November 16, 2001. Tr. at 190-194. During the visit, Plaintiff complained of pain between the shoulder blades and into the neck, primarily on the right side, and indicated he was going through physical therapy. Tr. at 190. Plaintiff was given samples of Celebrex and prescribed Darvocet. Tr. at 190-193.

**Andrews Center** records span the time period from July 11, 1992 through January 19, 2012. Tr. at 195-205; 239-275; 444-461. In 1995, Plaintiff was diagnosed with paranoid schizophrenia, and prescribed Haldol. Tr. at 273. At one point, Plaintiff was paranoid of an EKG, asserting his doctor "wants to mess him up." Tr. at 261. He was violent with his fiancé, eventually nearly choking her to death. Tr. at. 253. On March 30, 1998, she reported Plaintiff's attempts to run her down with his car, pulling a knife on her, and head-butting her. *Id.* She also reported he was no longer participating in therapy because he believed the doctors were using medication to "gain control of his mind." *Id.*

On August 12, 2002, Plaintiff requested a letter stating his schizophrenia keeps him from being employed. The staff physiatrist, however, indicated he could not make that statement, as Plaintiff was unemployed due to back problems rather than mental. Tr. at 244. On February 24, 2003, Plaintiff reported being out of medication for three weeks, irritable, and "hard to be around people." Tr. at 242. Plaintiff also reported his back was improved. *Id.*. Treatment notes on August 27, 2003 indicated Plaintiff "reports doing better than he has in a long time" and "when angry, he distances himself." Tr. at 241. Plaintiff was eventually discharged on March 11, 2004 when he had no services in over six months. Tr. at 239.

Plaintiff returned to Andrews Center for an appointment on September 29, 2011 when he reported paranoia, panic attacks, seeing shadows and ghosts, and was assigned a GAF score of 41. Tr. at 465. His prescription for Trazodone was increased. Geodon was added to assist his

7

mood, anxiety, and voices. *Id.* Improvement was demonstrated on November 23, 2011 (Tr. at 448) and on December 5, 2011, Plaintiff denied suicidal/homicidal ideation, audio/visual hallucinations, side effects or abnormalities and indicated his appetite and sleep were adequate with medications. Tr. at 447. Plaintiff was subsequently switched from Geodon to Latuda, but continued to experience insomnia and paranoia, as well as auditory hallucinations, which had decreased in intensity. Tr. at 448, 450-452.

**Dallas VA Medical Center** records span the time period from October 27, 2001 through December 19, 2011. Tr. at 206-238, 336-361, 380-433. An MRI conducted on October 27, 2001 demonstrated incomplete segmentation of the C4 through C6 vertebral bodies with mild degenerative changes at the C3-4 level with narrowing of the central canal to 9mm and associated narrowing of the neural foramina. Tr. at 227-229. An MRI of the lumbar spine revealed mild degenerative changes, without significant stenosis of the central canal or neural foramina. *Id.*

On January 29, 2002, Plaintiff visited Pain Management Service with complaints of worsening neck pain over 14 years, resulting in his taking his mother-in-law's Vicodin and Darvocet rather than Soma and NSAIDS which bother his stomach. Tr. at 352-353. Treatment notes indicate his hobbies included exercising, fishing and going to the woods. Tr. at 353. Plaintiff additionally denied any delusions, hallucinations or anxiety *Id*. The physician noted Plaintiff had full and active range of motion of the back; movement of all extremities with full active range of motion, except the C-spine with limited left/right rotation of 0 to 45 degrees on the right and 0 to 30 degrees on the left. Tr. at 354. There was full flexion and extension of the neck with a strength rated 4/5 and he was able to ambulate/stand on heels/toes without any difficulty, and had no gait instability. *Id.* Cranial nerves II-XII were grossly intact, and his

motor function was stable, with good muscle bulk. *Id.* Further a Sensory Nerve Conduction Study was normal and showed no evidence of any neuropathy or radiculopathy of the right upper limb. Tr. at 352.

With the encouragement of his family, Plaintiff resumed mental health treatment on August 10, 2007, reporting auditory hallucinations, frequent fears of someone hitting him from behind, visual hallucinations in the form of a "ghost lady," and irritability, especially when around other people who he felt were insulting him or standing too close to him. Tr. at 345. Additionally, Plaintiff believed people can insert thoughts by talking to him and can thereby control him. *Id.* His contact with psychiatrists at that point had been intermittent, but a year prior, he stopped seeing a psychiatrist because of delusions that the psychiatrist and his wife had been plotting against him. *Id.* Plaintiff was diagnosed with chronic paranoid type schizophrenia and panic disorder, assigned a GAF rating of 45, and his dose of Seroquel was increased to 300 mg. Tr. at 348. The psychiatrist assessed a "poor to fair prognosis based on the chronic nature of the illness, intermittent compliance with treatment, limited coping skills, and impaired cognition associated with schizophrenia." *Id.* He further advised that Plaintiff is not a suitable candidate for an anxiety group due to paranoia and would likely have difficulty with individual therapy as well as a result of paranoia and cognitive deficits. *Id.*

At a follow up appointment on September 21, 2007, Plaintiff complained of paranoid schizophrenia, chronic neck pain, and low back pain, "wanting to get back into the system" having problems at home with paranoia and anger. Tr. at 341. He feels like "someone is trying to hurt him." *Id.* As to his neck and back pain, he reported good results with Vicodin, with no associated weakness of extremities or loss of sphincter control. *Id.* An EMG/NCS revealed no radiculopathy. He was also taking 200 mg seroquel to enable sleep and eliminate nighttime

hallucinations. However, he had paranoid delusions during the day, leading to a scuffle with a stranger and therefore, he was camping outdoors half of the time to be alone. He has been out of Gahapentin for weeks, but has not been overly anxious nor has had further panic attacks. Tr. at 342. The psychiatrist again assigned a GAF rating of 45, and observed that Plaintiff exhibited poor insight, fair judgment, a flat affect, and impaired memory, concentration, and attention. *Id.* His seroquel was increased to 300 mg with the ultimate goal of 400 mg to treat his phychosis. *Id.*

On October 18, 2007, Plaintiff reported problems at home as a result of his paranoia and constant anger. Tr. at 341. He continued to feel as though someone was going to hurt him, so he was always on guard. *Id.*

Following Plaintiff's last insured date of December 31, 2007, Plaintiff presented with schizophrenia and panic disorder on June 6, 2008. Tr. at 338. He was taking 300 mg of Quetiapine at bedtime to help with sleep and eliminating noises, but stopped because it was making him too tired and drugged out. His prescription was decreased to 25-50 mg. *Id.*. A note from his primary physician that same day revealed Plaintiff had not followed up following his last mental health evaluation due to transportation problems. Additionally, taking Neurontin has been all that he needs, and he requested a refill as he has been out for one month. *Id.*. He was taking vicodin for back pain with good result, and an EMG/NCS did not show radiculopathy. *Id.*. Dr. Haque reported Plaintiff is currently without any bizarre thought patterns or hallucinations, but has occasional non-comprehendible voices. Tr. at 340.

On June 14, 2011, Plaintiff was prescribed Etodolac for chronic back pain and his desire to not take narcotics. Tr. at 413. He subsequently reported that the medication works for him. Tr. at 414.

On January 20, 2012, Plaintiff complained of depressed mood, anger and irritability, anxiety, and auditory hallucinations. Tr. at 397. These symptoms had decreased in intensity since starting Latuda as prescribed at the Andrews Center. *Id.* During this appointment, Plaintiff displayed a restricted affect and was assigned a GAF rating of 53. Tr. at 407-408. He was started on Risperdal in lieu of Latuda, and continued on Trazodone and Gabapentin. Tr. at 408.

**Chiro Health** records span from April 5, 2004 to January 8, 2005. Tr. at 276-291. Plaintiff initially visited on April 5, 2004 with complaints of right shoulder pain for six months. Tr. at 279. As of January 11, 2005, Plaintiff reported not taking any medications except Excedrin. Tr. at 280. However, X-rays of the cervical spine on that date demonstrated congenital block vertebra at C4, C5 and C6 that may be contributing to a localized mid cervical dextroscoliosis; discogenic spondylosis at C3-4 and C6-7; and spina bifida occultae in the cervical and thoracic spines. Tr. at 291. X-rays of the thoracic spine showed lower thoracic spondylosis; right towering of the upper thoracic spine with multiple levels of vertebral body rotation and thoracic hypokyphosis with lumbar hypolordosis and posterior weight bearing. *Id.* X-rays of the lumbar spine revealed lumbus bone at L4. *Id.*

**Consultative Examiner Robert B. Thompson, M.D.** examined Plaintiff on March 24, 2005. Tr. at 292-296. X-rays of the right hip demonstrated no acute findings and x-rays of the left shoulder were negative. Tr. at 294-295. X-rays of the lumbar spine, indicated what appears to be an old compression fracture involving the anterior superior aspect of L4; alignment of the spine was preserved, disc spaces were without narrowing and the S1 joints were symmetric Tr. at 296.

A consultative examination report was submitted by **Tyler Counseling and Assessment Center**, dated March 24, 2005. Tr. at 297-302. Plaintiff reported a lifelong history of mental

illness to include major depression, anxiety, auditory hallucinations, and paranoia, dating to his childhood, when he and his family were abused by his father. Tr. at 297. The Psychologist noted Plaintiff sat with a tense and rigid posture, while his general motor behavior evidenced agitation and restlessness, while he rocked side to side throughout the evaluation. Tr. at 299. He additionally noted that Plaintiff appeared avoidant and paranoid and may also suffer from delusions. Tr. at 300. Plaintiff was diagnosed with recurrent severe major depressive disorder, paranoid personality disorder, rule out anxiety disorder, and rule out schizophrenia, paranoid type. Tr. at 301. Finally, the Psychologist stated Plaintiff "is likely to continue to experience emotional and life adjustment difficulties even with aggressive psychiatric treatment and counseling." *Id*.

Tyler CBOC, or **Tyler VA Primary Care Clinic** records span the time period from April 7, 1999 through December 28, 2010 and March 9, 2011 through January 20, 2012. Tr. at 303-335; 434-443. On April 15, 2010, Plaintiff reported chronic neck and low back pain for which he took some of his wife's medication. Tr. at 317. He was prescribed 400 mg Gabapentin and 25 mg Hydroxyzine HCL. Tr. at 318. He returned for a refill of Gabapentin to continue helping with his sleep on May 25, 2010. Tr. at 314. On October 8, 2010, Plaintiff reported falling and his legs "giving out" due to back pain. Tr. at 309. A hearing examination demonstrated the claimant had normal hearing limits in the right ear, with mild to moderate sensorineural hearing loss, and normal hearing limits in the left ear, with a moderate sensorineural hearing loss. Plaintiff demonstrated excellent word recognition ability, bilaterally. Tr. at 310.

On December 28, 2010, Plaintiff indicated he has had panic attacks off and on for three years. Tr. at 306. He had never been seen by Mental Health with the Tyler VA, but had been seen at DVAMC approximately two years prior. Tr. at 306.

Finally, Plaintiff underwent chiropractic care through **Hood Chiropractic** from April 27, 2011 through August 15, 2011 with nothing significant in the record to report.  Tr. at 462-507.

*Hearing Summary*

At the administrative hearing, Plaintiff testified that he was born on October 31, 1962.  Tr. at 35.  He testified that he is married with one daughter, that he does not communicate with, and several stepchildren.  Tr. at 42-43.  He has two years of college education and an Associate's Degree from Tyler Junior College.  *Id.* at 36, 39.  His past relevant work experience includes 15 years as an eyeglass maker.  *Id* at 36.  However, Plaintiff testified he could not turn his neck to look through the instrumentation required to make glasses as a result of neck and back injuries.  His attempts to elevate the equipment so he would not have to lean over were eventually ineffective.  Tr. at 38.  As a result, his boss placed him on "indefinite medical leave" in 2002 and Plaintiff has not worked since.  Tr. at 37.

Plaintiff additionally testified that his neck and back injuries were sustained during his time in the service.  Tr. at 38.  He was honorably discharged from the U.S. Navy as a result of the injuries on November 1989.  Tr. at 39.  The VA has assessed him as 80 percent disabled and placed him on 100 percent "unemployability."  Tr. at 40.  Fifty percent of his disability is attributed to psychological issues.  Tr. at 41.  Plaintiff stated he was told at the time he left the service that he would eventually need surgery for the fused vertebra in his neck and the bone spurs growing as a result of limited movement.  Tr. at 41.  Since then, surgery has not been recommended for his neck or back except for a morphine pump which he does not want.  Tr. at 40-41.  When asked by the ALJ, he stated he is not overweight.  Tr. at 42.

Plaintiff testified that he can only sit for a few minutes and has to stand or walk every four or five minutes, with the pain alternating between sitting and standing.  Tr. at 44-45.  He

13

started on and off mental health treatment in the early 90's, and has been on Neurontin ever since. Tr. at 46. Plaintiff testified that at one point a psychologist recommended that he be committed, but he did not want that. *Id.* He has been diagnosed with a depressive disorder, panic disorder, and paranoid schizophrenia. *Id.* He has difficulty sleeping, and largely avoids interaction with people as he prefers to be alone. He does not have any friends, nor does he want any. *Id.* Additionally, Plaintiff testified that he has poor memory and about once per month, he does not care to live. *Id.* Prior to any errand, Plaintiff testifies that he has to visualize the entire errand. He enjoys going to wildlife refuges for a weekend or a couple days. Tr. at 50. Finally, Plaintiff testified that he is a member of several veterans' organizations, but he just donates money and does not attend meetings. Tr. at 51.

The Vocational Expert (VE) testified that Plaintiff's past relevant work as an eyeglass maker is classified as light and semiskilled, but does not involve any transferrable skills. Tr. at 52.

### *The Commissioner's Step Two Determination*

> To be entitled to disability insurance benefits,
>
> an applicant must show that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to ... last for a continuous period of not less than twelve months. . . ." 42 U.S.C. § 423(d)(1)(A). Under this provision a "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

*See Villa*, *supra*, 895 F.2d at 1022. As outlined above, a five-step sequential evaluation process is used.

At Step Two of the sequential evaluation process, the ALJ must determine whether a claimant's medically determinable impairments are severe or non-severe. A determination that a

medically determinable impairment is severe permits the analysis to go forward, potentially through all five steps to find whether the claimant is disabled or not under the Act. However, "[a]n individual who does not have a 'severe impairment' will not be found to be disabled." *Id*. In other words, if the claimant's impairments are not "severe," the analysis stops and the claimant is *a priori* not disabled.

The standard in the Fifth Circuit for determining whether a medically determinable impairment is "severe" is *Stone*, 752 F.2d at 1101. There, the Fifth Circuit expressed the severity standard as, "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Id*. (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984) (per curiam)). Furthermore, the Fifth Circuit held, "we will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) (1984) is used. Unless the correct standard is used, the claim must be remanded to the [Commissioner] for reconsideration." *Id*. at 1106.

Here, the ALJ found at Step Two that Plaintiff's mild degenerative disc disease of the cervical spine, without radiculopathy; mild spondylosis and degenerative disc disease of the lumbar spine, without radiculopathy; and schizophrenia was medically determinable during the relevant period, but that the medical evidence of record supported a finding of no limitation on his ability to perform work-related activities. Tr. at 14, 17.

The first question that arises is whether the ALJ applied the correct standard for determining severity under *Stone*. While the ALJ mentions the *Stone* test for severity, the Court finds the ALJ's analysis is contrary to the medical evidence in the record and an examining

15

psychologist. A review of the medical record depicts Plaintiff with active psychosis and schizophrenia resulting in more than a "minimal" impairment.

First, the ALJ merely summarized the findings and opinions of Dr. Lenert, an examining psychologist[1] at the Tyler Counseling and Assessment Center. Tr. at 19, 25. However, the ALJ did not explicitly assign that opinion any weight, only stating that he had given it "due consideration." *Id.* Because State Agency and other program psychological consultants are experts in the Social Security disability programs, the rules in 20 C.F.R. § 404.1527(f) require the ALJ to consider their findings of fact about the nature and severity of an individual's impairment(s) as a medical opinion. Generally, more weight is given to the opinion of a source, such as Dr. Lenert, who has examined the claimant rather than the opinion of a source who has not examined the claimant. 20 C.F.R. § 404.1527(c)(1). Regardless, Social Security Ruling ("SSR") 96-6p specifies that an ALJ may not ignore these opinions and must explain the weight given to them, which was not done here. SSR 96-6p, 1996 WL 374180 (S.S.A. July 2, 1996).

Here, Dr. Lenert diagnosed Plaintiff with recurrent severe major depressive disorder, paranoid personality disorder, rule out anxiety disorder, and rule out schizophrenia, paranoid type, and assigned a GAF rating of 30. Tr. at 301. Tellingly, his notation that Plaintiff "is likely to continue to experience emotional and life adjustment difficulties even with aggressive psychiatric treatment and counseling" is absent from the ALJ's decision and analysis. *Id.* The ALJ's statement that he gave "consideration" to Dr. Lenert's opinion does not satisfy the ALJ's duty to explain his basis for rejecting the opinion, particularly in light of the statement that even with treatment, Plaintiff is "likely to continue to experience emotional and life adjustment difficulties" Tr. at 301. Additionally, a GAF rating of 30 indicates that "behavior is

---

[1] While Plaintiff characterizes Dr. Lenert as the "SSA's examining expert," it is unclear from the record which agency presented Plaintiff for this exam. The record merely shows that the report was submitted to DARS, presumably the Department of Assistive and Rehabilitative Services. Tr. at 302.

considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas." *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) (DSM-IV-TR).[2] Thus, Dr. Lenert's opinion does not support the ALJ's ultimate finding that Plaintiff's mental impairments caused little or no impact on his work capacity. Further, Dr. Lenert's assessment that Plaintiff "is likely to continue to experience emotional and life adjustment difficulties even with aggressive psychiatric treatment and counseling" clearly meets the required *de minimus* test, intended to weed out the most minor of impairments at this stage of the disability analysis. *Bowen v. Yuckert*, 482 U.S. 137 (1987).

Similar to the analysis of Dr. Lenert's opinion, the ALJ's analysis of Plaintiff's status as a disabled veteran was insufficient. Medical records indicate Plaintiff has been rated at 80% service-connected disable, with 50% for psychosis; 40% back strain; 30% limited motion in cervical spine and 0% hearing. Tr. at 389. The only analysis conducted by the ALJ regarding this rating is stating that the determination by the VA is not binding on the SSA. While it is true under 20 CFR § 404.1504 and 416.904 that disability decisions made by another agency is not binding on the SSA, the Fifth Circuit has held that it is evidence entitled to great weight. Specifically, the "mere mention" of the VA rating is insufficient as a matter of law, without more, to support a denial of benefits. *Loza v. Apfel*, 219 F. 3d 378 at 394, 395 (5th Cir. 2000); *Shalala*, 36 F.3d at 483. Here, the ALJ has failed to provide explanation beyond listing the disability and its non-binding status. Thus the ALJ is required to explain his reasons for rejecting the VA's assessment in support of his denial of benefits.

---

[2] The Court notes that the American Psychiatric Association recently deleted the GAF scale from its revised Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition: DSM–5 (5th ed. 2013). However, Administrative Message AM–13066 notes that a GAF rating from an acceptable medical source is a medical opinion that the ALJ should consider and weigh with all the relevant evidence. *Locure v. Colvin*, No. CIV.A. 14-1318, 2015 WL 1505903, at *10 (E.D. La. Apr. 1, 2015). Here, the GAF score was only one portion of the medical record, and was substantiated by further evidence of Plaintiff's psychosis.

Finally, the ALJ gave "greater weight" to the opinion of the State Agency's expert, Dr. Geary, who merely conducted his assessment regarding the severity of Plaintiff's impairments based on a review of the record. Tr. at 25. This is assigning greater weight to a consultant that did not even examine Plaintiff. The primary basis for Dr. Geary's assessment was "insufficient evidence." Tr. at 362. *See* 20 C.F.R. § 404.1527(c)(1) (where generally more weight is given to the opinion of a source who has examined the claimant rather than the opinion of a source who has not examined the claimant). Specifically, Dr. Geary specified "sporadic treatment" as a basis for his finding. Tr. at 374. However, Dr. Geary did not discuss evidence that Plaintiff avoided treatment due to his paranoia, directed at his treating sources. Tr. at 261, 345. Moreover, Plaintiff's treating physicians should have been accorded greater weight. Under the treating physician rule, "[t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Here, Plaintiff's psychiatrist at the Dallas VA Medical Center assessed a "poor to fair prognosis based on the chronic nature of the illness, intermittent compliance with treatment, limited coping skills, and impaired cognition associated with schizophrenia." Tr. at 348. His psychiatrist further advised that Plaintiff is not a suitable candidate for an anxiety group due to paranoia and would likely have difficulty with individual therapy as well as a result of paranoia and cognitive deficits. *Id.* Like the assessment of Dr. Lenert's opinion discussed above, this analysis was not discussed in the ALJ's decision, nor did the ALJ articulate why he discounted these medical assessments. Without such information, the Court is unable to find that the ALJ's finding is based on substantial evidence. *See Newton*, 209 F.3d at 455 ("The ALJ's decision must stand or fall with the reasons set forth in

the ALJ's decision, as adopted by the Appeals Council."). Accordingly, this case should be remanded for further consideration related to the finding of non-severity.

## CONCLUSION

In light of the foregoing, the Commissioner's final decision is **REVERSED** and **REMANDED** to the Commissioner for further administrative proceedings.

**So ORDERED and SIGNED this 9th day of June, 2015.**

*[signature: John D. Love]*
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE
